UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

In re GIANT INTERACTIVE GROUP,          07 Civ. 10588 (RWS)
INC. SECURITIES LITIGATION

This Document Relates To:               OPINION

    ALL ACTIONS

----------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiffs

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8 | 7 | 09
```

        COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
        58 South Service Road, Suite 200
        Melville, NY  11747
        By:  Mario Alba, Jr., Esq.
             Samuel H. Rudman, Esq.

        ABRAHAM FRUCHTER & TWERSKY LLP
        One Pennsylvania Plaza, Suite 2805
        New York, NY  10119
        By:  Jack G. Fruchter, Esq.

        BRODSKY & SMITH, L.L.C.
        240 Mineola Blvd.
        Mineola, NY  11501
        By:  Even J. Smith, Esq.

        Attorneys for Defendants

        O'MELVENY & MYERS LLP
        7 Times Square
        New York, NY  10036
        By:  Jonathan Rosenberg, Esq.
             Lori E. Romley, Esq.
             Meredith N. Landy, Esq.
             Seth Aronson, Esq.

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY   10019

By:   Alfred R. Pietrzak, Esq.
      Andrew S. Stern, Esq.
      Dorothy J. Spenner, Esq.
      Vikeena K. Bonett, Esq.

**Sweet, D.J.**

Defendants Giant Interactive Group Inc. ("Giant" or the "Company"), Merrill Lynch & Co. Inc. ("Merrill Lynch" or "Defendant Merrill"), and UBS Investment Bank ("UBS" or "Defendant UBS") (collectively, the "Defendants") have moved pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the Consolidated Amended Complaint of Lead Plaintiffs Dunping Qui, Yihua Li, Xie Yong, Linming Shi, and Arthur Michael Gray (collectively the "Lead Plaintiffs"), alleging federal securities violations arising out of Giant's initial public offering on or about November 1, 2007 (the "IPO" or the "Offering").

Based upon the conclusions set forth below, the motion is denied.

## I. PRIOR PROCEEDINGS

The initial complaint in this action was filed on November 26, 2007. By order of August 5, 2008, this and other actions were consolidated, and Lead Plaintiffs and counsel selected. The Consolidated Amended Complaint ("CAC") was filed on October 6, 2008, on behalf of all

2

persons other than Defendants who purchased the American
Depositary Shares ("ADSs") of Giant pursuant and/or
traceable to Giant's IPO on or about November 1, 2007
through November 19, 2007, inclusive (the "Class Period"),
alleging violations of Sections 11 and 12(a)(2) of the
Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§
77k & 77*l*(a)(2).

Defendants' motion to dismiss was heard and
marked fully submitted on February 25, 2009.

## II.  **PLAINTIFFS' ALLEGATIONS**

The following allegations, taken from the CAC,
are accepted as true for the purpose of resolving the
motion to dismiss.

### A.  **Defendant Giant Interactive**

Giant describes itself as one of China's leading
online game developers and operators and focuses on
massively multiplayer online ("MMO") games.  MMO games are
played through networked game servers in which tens of

3

thousands of players are able to simultaneously connect and interact. CAC ¶ 19.

Giant offers three MMO games, including ZT (or "Zheng Tu" in Chinese) Online, a free-to-play online two-dimensional role playing game set in ancient China. In ZT Online, players develop skills, use magical weapons and team up with other players to fight against monsters and players from other kingdoms. Free-to-play MMO games enable players to play the game for free, and the Company generates revenue by selling game points for in-game premium features such as virtual products and services to players. In addition to ZT Online, Giant offers ZT Online PTP, a pay-to-play game based on the ZT Online game, and Giant Online, another free-to-play military themed game. CAC ¶¶ 20-21.

Giant generates revenues from ZT Online from the sale of prepaid game cards which represent a specified amount of game points. The game points are registered to the purchaser's game account and are then used to purchase a virtual product or service in the game, e.g., a virtual shirt, a virtual potion or a virtual sword. Id. Revenues from ZT Online accounted for all of Giant's 2006 net

4

revenues and nearly all of the Company's 2007 revenues.
CAC ¶ 25.

The original metric used to assess an MMO game's
revenue and popularity in a pay-to-play game was the
subscription figure. CAC ¶ 26. However, in a free-to-play
game such as ZT Online there are no subscription fees, and
the number of users who open an account is unreliable as a
measure of the game's popularity as there is no cost to
play the game. Therefore, the key metrics for measuring
and anticipating profitability are the peek concurrent
users ("PCU") and average concurrent users ("ACU")
statistics which measure the number of players logged onto
the game at any one time. The more people actively playing
the MMO games, the more game points they will purchase.
Id.

**B.    The IPO**

On or about October 31, 2007, Giant filed a Form
F-1/A Registration Statement with the Securities and
Exchange Commission ("SEC") for the IPO. On or about
November 1, 2007, the Prospectus, which forms part of the
Registration Statement, became effective and more than 57

million shares of Giant's ADSs at $15.50 per ADS were sold to the public, thereby raising more than $886 million. The Company sold 52,467,723 ADSs and Jing Shi, the daughter of Yuzhu Shi, Giant's chief executive officer and chairman, sold 4,729,700 ADSs in the Offering. An additional 8.6 million ADSs at $15.50 per ADS were sold when the underwriters exercised their over-allotment option. CAC ¶¶ 22-23. UBS and Merrill Lynch served as the lead underwriters and joint bookrunners for the IPO, and each purchased 22,521,486 ADSs from the Company. UBS and Merrill Lynch earned at least $45 million as a result of their sale of Company ADSs to public investors in the IPO. CAC ¶ 24.

In the Registration Statement, the Company highlighted the increases in ZT Online's PCU and ACU numbers, stating, in pertinent part:

    ZT Online's compound quarterly growth rate was
    39.6% and 45.3%, respectively, in terms of peak
    concurrent users and average concurrent users
    from the quarter ended March 31, 2006 through the
    quarter ended September 30, 2007.

6

CAC ¶ 28.  Similarly, the Registration Statement contained
a chart highlighting the Company's rising ACU and PCU
trends.  CAC ¶ 29.

According to Plaintiffs, however, Giant
experienced a decline in its ACU and PCU figures between
the second and the third quarter of 2007 as a result of a
rule change designed to discourage "gold farming
activities" in ZT Online.  "Gold farming" is an activity in
which a MMO game player attempts to acquire ("farm") items
of value within a game, usually by exploiting repetitive
elements of the game's mechanics.  This is usually
accomplished by carrying out in-game actions (such as
killing an important creature) repeatedly to maximize gains
and is generally conducted by companies that hire people to
play online games so that they can generate online currency
which is then sold on third-party websites for real cash to
actual players who will then use the gold coins in the
game.  CAC ¶ 32.

Plaintiffs allege that although the Registration
Statement contained the ACU and PCU figures for the quarter
ended September 30, 2007, it failed to disclose the
magnitude of the gold farming problem or that the ACU and

PCU numbers were over-inflated by the inclusion of "gold farmers." CAC ¶¶ 31, 33. Plaintiffs also allege that the Registration Statement failed to explain or describe the rule change in any meaningful fashion, did not highlight the negative trend in ACU and PCU figures, and did not disclose the negative impact that the rule change was having at the time of the IPO. CAC ¶ 32.

On November 19, 2007, after the close of the market, Giant announced its financial results for the third quarter of 2007, the period ended September 30, 2007. CAC ¶ 39. Among other things, the Company reported that ACU for the third quarter was 481,000, a decrease of 6% from the second quarter of 2007, and that PCU for the third quarter was 888,000, a decrease of 17.2% from the second quarter of 2007. Id.

In a Form 6-K filed with the SEC on November 20, 2007, Giant attributed the decrease in ACU and PCU to a June 2007 game rule change instituted to discourage "gold farming" activities. CAC ¶ 40.

Also, on November 20, 2007, before the market opened, Giant held a conference call with analysts and

8

investors to review its earnings release. CAC ¶ 41.
During the conference call, Giant attributed the decline in
the third quarter ACU and PCU figures to a rule change to
ZT Online that was implemented in June 2007 to discourage
gold farming activity. During the conference call, Giant's
CEO described the pervasiveness of gold farming in the
Chinese MMO game environment and its significance on ZT
Online and online games in general. CAC ¶ 42. The
following exchange took place:

OPERATOR: (Operator Instructions)

Your next question comes from the line of Gerard
Sullivan, American Century. Please proceed.

GERARD SULLIVAN, ANLAYST, AMERICAN CENTURY:
Thank you. I wonder if you could just back up a
little bit to me and talk about the - both the
change in the game rules that discourage gold
farming and I guess gold farming by that you mean
sort of an experimental play or looking around or
some kind, and why you did that, why that is good
for the long term? I'm just curious if it
doesn't discourage players to test the game and
ultimately become payers. That's - so, I just
wanted some clarification on it, thank you.

UNIDENTIFIED COMPANY REPRESENTATIVE: (Spoken in
Chinese) Mr. Shi will answer the questions for
you.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE:
(interpreted) First of all, it's actually quite a
popular phenomenon in China. There are a lot of
gold farming companies. They are pretty

9

pervasive actually existing in all kinds of games in China.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) We actually are seeing great damage from this group of companies.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) Especially in free-to-play type of games, their existence actually generated artificially inflated supply in terms of the gold coin or the virtual currency in games. That actually creates the inflation within the game.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) So, it's actually for the benefit or the balance of the game or for the playability of the game to get rid of this group of undesirable target group.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) It is actually a common challenge facing almost all the online games in China.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) We are probably the most effective Company in implementing such policy. Especially in June, we have seen great results in getting rid of or identifying these groups of undesirable users and successfully reduce those numbers. So far after the policy change or the change of game rules, we have been continuously witnessing the increase in ATU [sic] and PCU members.

ERIC HE: Did we answer your question?

GERARD SULLIVAN: I'm sure you did, but I just wanted to maybe ask for my own clarification. What does it mean, what does gold farming mean? Obviously, it's an undesirable group and do they - when you say they do damages, do they actually do sort of sabotage damage, or just taking up space and room that other paying customers could use?

ERIC HE: (Spoken in Chinese)

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) Technically speaking, they don't cause direct damage to the existing players since they don't actually involve in the game play.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) What those gold farming companies do is essentially they hire a bunch of people, it could be hundreds of even thousands of people just playing games without interacting with other users to gain virtual currencies in game and sell those currencies on the other websites for [the revealed] cash, which is RMB.

YUZHU SHI: (Spoken in Chinese)

UNIDENTIFIED COMPANY REPRESENTATIVE: (interpreted) So, in the short term, you may see those people actually generating or sort of creating virtual currency playing the game, but in the long run, with this group of peoples presence, they are actually reducing the economic benefit for the game in the long run, since they are not actively the paying players. And secondly -

ERIC HE: Secondly, it will create inflation within the game.

YUZHU SHI: (Spoken in Chinese)

11

UNIDENTIFIED COMPANY REPRESENTATIVE:
(interpreted) According to some unofficial
statistics, we are seeing more than 800,000
people engaging in gold farming activities.

GERARD SULLIVAN: Wow, okay. All right that's
great. Good answer. Thank you very much.

CAC ¶ 42.

Following the Company's November 20, 2007
earnings release and conference call, the price of Giant
ADSs dropped from $14.88 per ADS to $11.10 per ADS on
extremely heavy trading volume. CAC ¶ 43.

**III. DISCUSSION**

**A.    The Rule 12(b)(6) Standard**

In ruling on a motion to dismiss made pursuant to
Rule 12(b)(6), the Court must accept all well-pleaded
factual allegations in the complaint as true. Erickson v.
Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atlantic Corp.
v. Twombly, 550 U.S. 544, 555 (2007)). In addition, the
Court must "construe[] the complaint liberally" and "draw[]
all reasonable inferences in the plaintiff's favor."
Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.

2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)). The question before the court "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36 (1974)). Consequently, the complaint should not be dismissed on a motion for judgment on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. Faconti v. Potter, 242 Fed. App'x 775, 777 (2d Cir. 2007).

In considering a motion to dismiss on the pleadings, the Court may also consider any documents attached to the complaint or incorporated by reference into the complaint. Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994) (citation omitted). In the context of a securities action, the complaint is properly deemed to include "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."

13

Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)
(internal cites omitted).

"To allege a claim under Section 11 of the
Securities Act, a plaintiff need show that a registration
statement: (1) contained an untrue statement of material
fact; (2) omitted to state a material fact required to be
stated therein; or (3) omitted to state a material fact
necessary to make the statement therein not misleading."
Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 408
(S.D.N.Y. 2007) (internal quotes and cites omitted).
Pleading a Section 11 claim is not difficult: "[t]o
establish a prima facie Section 11 claim, the plaintiff
need only plead a material misstatement or omission in a
registration statement." In re WRT Energy Sec. Litig., No.
96 Civ. 3610 (JFK), 2005 WL 2088406, at *1 (S.D.N.Y. Aug.
30, 2005) (citing Herman & MacLean v. Huddleston, 459 U.S.
375, 382 (1983)). In addition, "[l]iability against the
issuer of a security is virtually absolute, even for
innocent misstatements," while "[o]ther defendants bear the
burden of demonstrating due diligence." Herman & MacLean,
459 U.S. at 382.

14

Similar standards apply to claims arising under Section 12(a)(2) of the Securities Act. Liability under Section 12(a)(2) is imposed on any person who offers or sells a security by means of a prospectus "'which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.'" Griffin v. PaineWebber, Inc., 84 F. Supp. 2d 508, 512 (S.D.N.Y. 2000) (citing 15 U.S.C. § 77l(a)(2)); Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 754 (S.D.N.Y. 2001) ("[T]o state a claim under either sections 11 or 12(a)(2), plaintiffs must demonstrate that the Prospectus contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements therein not misleading."), abrogated on other grounds by In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281 (S.D.N.Y. 2003); In re Worldcom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004).

Finally, the heightened pleadings standard of Rule 9(b), Fed. R. Civ. P., applies to claims brought under Sections 11 and 12(a)(2) insofar as they are premised on allegations of fraud. Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).

15

## B.    The CAC Adequately Alleges Securities Act Violations

The CAC alleges that the Registration Statement contained positive statements about the Company's ACU and PCU figures and highlighted positive trends for these metrics but failed to disclose that the Company had implemented a significant rule change to curtail gold farming for ZT Online which had caused a decline in the Company's ACU and PCU numbers between the second and third quarters of 2007. CAC ¶¶ 28-32. The CAC similarly alleges that the Registration Statement contained material misrepresentations regarding the reported ACU and PCU numbers because it failed to disclose that those numbers were inflated by the inclusion of gold farmers and did not disclose the prevalence of gold farming and the risks that activity presented to the Company. CAC ¶ 33. These allegations are sufficient to state claims for violations of Sections 11 and 12(a)(2). See, e.g., In re Prestige Brands Holding, Inc., No. 05 Civ. 6924 (CLB), 2006 WL 2147719, at *8 (S.D.N.Y. July 10, 2006) (finding allegations that registration statement misrepresented current demand and failed to disclose declining future demand for key products sufficiently stated a claim for

16

violations of §§ 11 and 12(a)(2)); Ottman v. Hanger
Orthopedic Group, Inc., 353 F.3d 338, 352 (4th Cir. 2003)
(holding that defendants' positive statements about the
integration of two businesses created a duty to disclose
that the combined company was experiencing a loss of
referral business); see also McMahan & Co. v. Wherehouse
Entm't Inc., 900 F.2d 576, 579 (2d Cir. 1990) ("[T]he
disclosure required by the securities laws is measured not
by the literal truth, but by the ability of the material to
accurately inform rather than mislead prospective
buyers.").

       Defendants do not challenge the legal sufficiency
of these allegations, but instead contend that Giant
disclosed that it implemented a rule change to discourage
gold farming and that ACU and PCU figures declined as a
result.  Specifically, Defendants cite the Registration
Statement's description of a May 2007 rule change
concerning payouts of gold tied to "virtual insurance
policies" and the accompanying drop in ACU and PCU numbers.
See Declaration of Jonathan Rosenberg ("Rosenberg Decl.")
Exh. B.

17

Plaintiffs, however, base their claims on a rule change concerning gold farming allegedly implemented one month later, in June 2007. In support of this allegation, Plaintiffs cite Giant's third quarter earnings announcement which states that there was a decline in third quarter ACU and PCU figures due to a rule change implemented in "June 2007." CAC ¶ 40; Rosenberg Decl. Exh. C at 2. Plaintiffs also cite statements made by Giant's CEO during an earnings conference call in November 2007 which also refer to actions taken in June 2007. See CAC ¶ 42; Rosenberg Decl. Ex. D at 2, 7. Additionally, the Complaint alleges that the third quarter conference call revealed that Giant took actions beyond rule changes to deter and eliminate gold farming activities. CAC ¶ 42. Thus, while the Registration Statement may have disclosed that ACU and PCU figures declined slightly from May 2007 to June 2007 due to the May 2007 rule change, Plaintiffs assert that it failed to disclose the second, June 2007 rule change that led to the decline in third quarter ACU and PCU figures.

In light of Plaintiffs' factual allegations concerning the existence of a second rule change in June 2007, Defendants' contention that it made only a single rule change concerning gold farming in May 2007 which was

18

fully disclosed in the Registration Statement presents a factual dispute inappropriate for resolution on this motion. See, e.g., Evercrete Corp. v. H-Cap Ltd., 429 F. Supp. 2d 612, 625 (S.D.N.Y. 2006) (concluding factual dispute could not be resolved on motion to dismiss); S.E.C v. Apolant, 411 F. Supp. 2d 271, 277 (E.D.N.Y. 2006) (noting all potential factual disputes must be resolved in plaintiff's favor on motion to dismiss) (citing S.E.C. v. Zandford, 535 U.S. 813, 818 (2002).

Giant has also contended that the Registration Statement disclosed the problem of gold farming and its impact on the Company's operations. While the Registration Statement refers to some individuals who purchased game-related products from third party websites, it does not use the term gold farming, and it does not mention the extent of the practice - for example, that companies were set up to engage in gold farming or that more than 800,000 people engaged in gold farming activities, as described in the November 20, 2007 conference call. See CAC ¶ 42. At best, Defendants have raised a factual issue as to the adequacy of the disclosures that cannot be resolved on this motion to dismiss.

## C. The Cautionary Language Does Not Require Dismissal

The Defendants have contended that the "bespeaks caution" doctrine renders any alleged omissions or misrepresentations in the Registration Statement not actionable because the Registration Statement contained adequate cautionary language concerning gold farming and its potential negative effects on Giant's business. Defendants have further contended that they warned investors about declines in the ACU since the Registration Statement mentioned Giant's May 2007 rule change and the corresponding 14.9% decline in the ACU in June 2007.

The Registration Statement disclosed the effect of gold farming generally and the existence of rule changes in connection with the promotions involving virtual insurance policies. However, those statements failed to disclose the extent of gold farming, the full scope of its impact on the ACU and PCU figures, or the second, June 2007 rule change concerning gold farming. Defendants cannot, as a matter of law, be absolved of liability pursuant to the "bespeaks caution" doctrine where they failed to disclose the existence of facts known for many months that would negatively affect Giant's business but only warned that

20

these facts "could" negatively affect their business. In re Regeneron Pharms., Inc. Sec. Litig., No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability pursuant to the bespeaks caution doctrine.") (citation omitted); In re Initial Public Offering, 358 F. Supp. 2d at 211-12 (holding generalized warnings about potential problems with email system were not sufficient given allegation that email system was failing at the time of the offering); Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc., No. 99 Civ. 12046 (WHP), 2001 WL 300733, at *8 (S.D.N.Y. 2001) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described."). Similarly, cautionary language that did not expressly warn of, or directly relate to, the risk that Plaintiffs allege brought about their loss (here, the practice and extent of gold farming) cannot trigger the "bespeaks caution" doctrine and shield Defendants from liability. See Halperin v. Ebanker USA.Com, Inc., 295 F.3d 352, 359 (2d Cir. 2002) (holding cautionary language insufficient to trigger "bespeaks caution" doctrine where it fails to

21

expressly warn of or does not directly relate to the risk that caused plaintiff's loss) (citing Hunt v. Alliance N. Am. Gov't Income Trust, 159 F.3d 723, 729 (2d Cir. 1998)).

Because the cautionary language contained in the Registration Statement failed to provide sufficient disclosure concerning the scope and impact of gold farming practices and the June 2007 rule change, Defendants cannot invoke the "bespeaks caution" to dismiss the Complaint.

## D.   Defendants' Negative Causation Defense Is Premature

Defendants also argue that the Complaint must be dismissed because any losses associated with the fall in Giant's stock price were not caused by Defendants' post-IPO disclosures.  Specifically, Defendants assert that the Registration Statement and Prospectus disclosed adequate information concerning changes in the rules relating to gold farming and the resulting decline in ACU and PCU figures, and neither the November 19, 2007 announcement of Giant's financial results nor the November 20, 2007 earnings conference call disclosed the rule change and decline in ACU and PCU figures for the first time.

As an initial matter, loss causation is not an element of a claim under either Section 11 or 12. See, e.g., Levine v. Atricure, Inc., 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) ("Loss causation . . . is not an element of a Section 11 claim under the Securities Act.") (citing In re Flag Telecom Holdings, Ltd. Sec. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), abrogated on other grounds, 2009 WL 2169197 (2d Cir. July 22, 2009)); Adair v. Kaye Kotts Assocs., No. 97 Civ. 3375 (SS), 1998 WL 142353, at *7 (S.D.N.Y. Mar. 24, 1998) ("Loss causation is not an element of a Section 11 claim."); Polycast Tech. Corp. v. Uniroyal, Inc., 792 F. Supp. 244, 259 (S.D.N.Y. 1992) (noting statutory sellers "'may now be liable under section 12 whether or not . . . loss causation is shown.'" (quoting Wilson v. Saintine Exploration and Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1989))); Freeland v. Iridium World Commc'ns, Ltd., 233 F.R.D. 40, 46 (D.D.C. 2006) ("The absence of loss causation is an affirmative defense under both Section 11 and 12 of the Securities Act rather than an element of Plaintiff's prima facie case."). Thus, Plaintiffs are not required to plead loss causation in the Complaint.

Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion. See, e.g., Levine, 508 F. Supp. 2d at 272-73 (observing negative causation defense usually raised on summary judgment or at trial due to fact-intensive nature); In re WRT Energy, 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005) (vacating earlier Rule 12(b)(6) dismissal for failure to establish loss causation and observing that "[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies."). Defendants, however, argue that the negative causation defense may be raised at the pleading stage where "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003).

While courts have, on occasion, found dismissal of Section 11 and 12 claims based on a negative causation defense proper in light of the allegations pleaded in the complaint, the cases cited by Defendants do not compel

dismissal of the instant claims. In both Akerman v. Oryx Communications, Inc. and In re Merrill Lynch, dismissal of the Sections 11 and 12 claims was based on the fact that the drop in stock price occurred prior to the disclosure of negative information to the public. Akerman, 810 F.2d 336, 341-42 (2d Cir. 1987); In re Merrill Lynch, 272 F. Supp. 2d at 253-54. Consequently, there could be no question that the drop in stock price was not be attributable to defendants' alleged misconduct.

In contrast, Defendants' negative causation defense is based on the disclosure of the May 2007 rule change and the decline in ACU and PCU figures in the Registration Statement three weeks before the Offering. However, as discussed supra, there exists factual disputes concerning the existence of a second, June 2007 rule change as well as the sufficiency of the Registration Statement's disclosures in connection with the decreases in the ACU and PCU figures. Given Plaintiff's factual allegations concerning the existence and impact of the June 2007 rule change, and drawing all reasonable inferences in Plaintiff's favor, it cannot be said as a matter of law that "it is apparent from the face of the complaint that

the plaintiff cannot recover her alleged losses." In re Merrill Lynch, 272 F. Supp. 2d at 253-54.

In further support of their loss causation defense, Defendants assert that the November 20, 2007 drop in stock price arose out of an erroneous report that Giant had missed analyst estimates of third quarter 2007 earnings. According to Defendants, Pali Research, an equity research firm, issued an analyst report on October 25, 2007, in anticipation of Giant's IPO which contained a discrepancy in its projections of Giant's third quarter earnings per share ("EPS"). On the first page, the report accurately states Giant's third quarter EPS projection of \$0.16. See Rosenberg Decl. Ex. G at 1. Later in the report, however, an "Earnings Model" incorrectly projects Giant's third quarter EPS to be \$0.21. Id. at 8. Thomson First Call, a financial reporting service, perpetuated this error by reporting the incorrect third quarter EPS projection of \$0.21. See Rosenberg Decl. Ex. E. When Giant announced third quarter earnings per share of \$0.19, news services, relying on Thompson First Call, incorrectly reported that Giant had missed analysts' estimates, when in fact Giant had beaten those estimates by three cents. Rosenberg Decl. Ex. C, E, F. The erroneous conclusion that

Giant had failed to meet earning expectations, Defendants assert, was the actual cause of the November 20, 2007 fall in Giant's share price.

Because the facts that Giant has submitted regarding the Pali Research report fall outside of the Complaint, they cannot be considered in deciding the instant motion. See, e.g., Adair v. Bristol Tech. Sys., Inc., 179 F.R.D. 126, 134-35 (S.D.N.Y. 1998) ("[T]he evidence advanced by Defendants is not within the four corners of the Complaint, and cannot be considered here." (citing Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988))). Defendants, however, argue that the proffered evidence merely serves to establish the underlying fact of the existence of the reports for which the Court may take judicial notice.

While the existence of the Pali Research reports may satisfy the requisites of asking the Court to take judicial notice, see Fed. R. Evid. 201(b), the existence of the reports alone does not establish the defense of negative causality. "§ 11 can be said to create a factual presumption that 'any decline in value is . . . caused by the misrepresentation in the registration statement.'"

Levine, 508 F. Supp. 2d at 272 (quoting McMahan & Co. v.

Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d Cir.

1995)); see also In re Flag Telecom Holdings, 245 F.R.D. at

159 n.12 ("[T]he burden of proving negative causation is on

the defendant . . . ." (quoting In re Worldcom, Inc. Sec.

Litig., No. 02 Civ. 3288 (DLC), 2005 WL 375314, at *6

(S.D.N.Y. Feb. 17, 2005))). The fact that the Pali

Research reports erred in their reporting of Giant's

projected EPS does not suffice in overcoming the

presumption in Plaintiffs' favor where the Court has not

had an opportunity to determine the relevance of the facts

in connection with Defendants' theory of loss causation.

See, e.g., Bristol Tech., 179 F.R.D. at 135 ("'[B]ecause no

expert analysis of the price issue has been provided, the

Court cannot discern from the evidence what part, if any,

[of the information] might have had on the stock price.'")

(second alteration in original) (quoting Adair, 1998 WL

142353, at *14); In re Livent, Inc. Noteholders Sec.

Litig., 174 F. Supp. 2d 144, 158 (S.D.N.Y. 2001) ("The

Court is not bound to deem true and give conclusive effect

to factual assertions stated in those submissions, which

'are relevant not to prove the truth of their contents but

only to determine what the documents stated.'") (quoting

Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.

1991)). Defendants will have the opportunity to prove, at the appropriate stage in the proceedings, that a portion of the damages suffered by Plaintiffs was caused by the theory they advance rather than by the alleged omissions in the Registration Statement.

## E. Class Definition Is Premature

Defendants also seek dismissal of the Section 12(a)(2) claims brought by Plaintiffs who purchased stock "traceable" to Giant's IPO, but not directly pursuant to the Offering. In support of their position, Defendants cite In re Cosi, Inc. Securities Litigation, which held that a Section 12(a)(2) claim "may only be maintained by a purchaser who purchased stock in the public offering at issue rather than in a secondary market transaction." 379 F. Supp. 2d 580, 588 (S.D.N.Y. 2005). While Cosi correctly noted that courts in this District had interpreted the Supreme Court's holding in Gustafson v. Alloyd Co., Inc. to preclude purchasers in private or secondary transactions from relief under Section 12(a)(2), 513 U.S. 561, 588-89 (1995), Cosi and the cases it relied upon were decided without the benefit of the Second Circuit Court of Appeal's decision in Yung v. Lee, 432 F.3d 142 (2d Cir. 2005).

In Yung, the Second Circuit interpreted Gustafson to establish the rule that "Section 12(a)(2) liability cannot attach unless there is an 'obligation to distribute a prospectus'. . . ." Id. at 149 (quoting Gustafson, 513 U.S. at 571). Because the private transaction at issue in Yung was not subject to the prospectus delivery requirements of the Securities Act, the court concluded that no Section 12(a)(2) liability could be found. Id. at 146. In so holding, the court established that the relevant inquiry in determining whether Section 12(a)(2) liability could attach was whether the sale of the security carried with it the legal obligation to provide a prospectus. See id. at 148-49. This is consistent with the language of Section 12(a)(2) itself, which "draws no express distinction between shares purchased in the initial distribution and shares purchased in the aftermarket," but instead requires that "a plaintiff have purchased a security, from a seller, pursuant to a misleading prospectus." Feiner v. SS&C Techs., Inc., 47 F. Supp. 2d 250, 252 (D. Conn. 1999) (citing 15 U.S.C. § 77l).

The Securities Act and related regulations require dealers to distribute a prospectus to purchasers up

to a specified number of days after the initial

distribution of shares. See Feiner, 47 F. Supp. 2d at 253

(citing 15 U.S.C. §§ 77d, 77e; 17 C.F.R. § 230.174). To

the extent that shares of Giant were purchased in the

aftermarket from the Underwriter Defendants acting as

dealers who had an obligation to distribute a prospectus,

Section 12(a)(2) liability could attach. See 15 U.S.C. §§

77d, 77e; 17 C.F.R. § 230.174.

Moreover, the facts with respect to the initial

distribution of the securities in question have not been

established on this motion. Therefore, Defendants'

argument is a premature attempt to limit the scope of the

class at the pleading stage. See, e.g., Krane v. Capital

One Servs., Inc., 314 F. Supp. 2d 589, 612 (E.D. Va. 2004)

(denying attempt to limit scope of class as premature at

the pleading stage).

Accordingly, Defendants' request to dismiss the

claims of Plaintiffs who purchased Giant stock traceable to

Giant's IPO is denied.

**IV. CONCLUSION**

31

For the reasons stated above, Defendants' motion

to dismiss the CAC is denied.

It is so ordered.

**New York, N.Y.**
**August**         , 2009

ROBERT W. SWEET
U.S.D.J.